**11**

**WANGER JONES HELSLEY PC**
265 E. River Park Circle, Suite 310
Fresno, CA 93720
Telephone: (559) 233-4800
Facsimile: (559) 233-9330

Kurt F. Vote #160496
kvote@wjhattorneys.com
Steven K. Vote #309152
svote@wjhattorneys.com

Attorneys for:     Creditor Sandton Credit Solutions Master Fund IV, LP

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF CALIFORNIA
# FRESNO DIVISION

| | |
|---|---|
| In re<br><br>4-S RANCH PARTNERS, LLC,<br><br>        Debtor.<br><br>EIN#     46-3161963<br><br>Address:     264 "I" Street<br>                     Los Banos, CA 93635-9363 | Case No. 20-10800<br><br>Chapter 11<br><br>**MOTION FOR RELIEF FROM STAY AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>WJH-1<br><br>**Hearing:**<br><br>Date: April 14, 2020<br>Time: 9:30 a.m.<br>Place: Courtroom 13<br>Judge: Hon. René Lastreto II |

       Movant Sandton Credit Solutions Master Fund IV, LP ("Sandton" or "Creditor") hereby moves this Court pursuant to 11 U.S.C. § 362(d)(2), and Local Bankruptcy Rules 4001-1(a), and in accord with Federal Bankruptcy Rule 9014, for relief from the automatic stay with respect to certain real property pledged as collateral to Creditor.

///

{8643/002/01071617.DOCX}     1
MOTION FOR RELIEF FROM STAY AND MEMORANDUM
OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

# I.

## INTRODUCTION AND FACTUAL BACKGROUND

Creditor's claim against Debtor in this proceeding arises from a loan made in August 2017 and secured by real property in Merced County. The loan was designed with favorable terms, such as no payments for the first year of the loan, to allow Debtor to complete its project to monetize the water rights to which it has access. Debtor's business plan was to commoditize its water and effectuate a plan to transfer that water to buyers, including water districts across the state, at a large scale. Debtor's plan has been a failure and the large-scale water sales upon which its business was based have not come to fruition. Debtor defaulted on its obligations and, since the origination of Creditor's loan in August of 2017, Debtor has made only a single payment which did not even cover a substantial part of the accrued interest on its obligations. Creditor then four times agreed to forbear from exercising its rights pursuant to the indebtedness, but Debtor was still not able to cure its defaults or pay off Creditor in full. Debtor has failed to generate any revenue from the real property which it owns and which it has pledged as security to Creditor. Now, Debtor has filed this proceeding to avoid a scheduled foreclosure sale of the real property referred to, *infra*, as the "4-S Property" and pledged as collateral for the loan.

As of the date the case was filed, the outstanding balance owed to Creditor totaled $57,264,545.53. The fair market value of the 4-S Property, on the other hand, is only $14,985,000.00. Even considering collateral pledged by a third party on Debtor's behalf[1], the outstanding indebtedness dwarfs the value of all security and Debtor simply has no equity in the 4-S Property. Further, notwithstanding the astronomical projection of the value of its assets in the Petition, Debtor freely admits it is a single asset real estate debtor. Debtor has failed for years to monetize its sole asset, the 4-S Property (and the water to which it has access), and cannot demonstrate any possibility of reorganization within a reasonable time.

Accordingly, Creditor respectfully requests that the Court grant it relief from the automatic stay to complete the foreclosure sale of the Deed of Trust on the 4-S Property.

---

[1] Stephen W. Sloan pledged real property he owned as collateral for the loan as well. That property was recently appraised at $12,520,000. See *infra*.

{8643/002/01071617.DOCX} 2

### A. The Loan Documents.

On or about August 14, 2017, Creditor made a loan (the "Loan") to Debtor in the principal amount of Thirty-Three Million Seventy-Five Thousand Eight Hundred Eighty-Seven and 92/100ths Dollars ($33,075,887.92), evidenced by a written promissory note (the "Promissory Note"). (Declaration of Robert Rice in Support of Motion for Relief from Stay, served and filed herewith [the "Rice Decl."], ¶ 4, Exh. A.) Pursuant to the Promissory Note, the principal balance would accrue interest based on a 360-day year in two (2) ways: (1) regular interest at a rate of 7% per annum ("Cash Interest"); and (2) deferred interest, or payment-in-kind interest, at a rate of 9% per annum ("PIK Interest").[2] (Rice Decl., ¶ 5.)

The Promissory Note provides that Debtor was to make regular monthly payments of all accrued Cash Interest throughout the life of the Loan, with the balance of accrued PIK Interest due and payable on the maturity date of August 14, 2019. (Rice Decl., ¶ 6.) Alternatively, the Promissory Note provides Debtor the option, for the first 12 months of the Loan, of converting the Cash Interest due to PIK Interest in lieu of a monthly payment. (Rice Decl., ¶ 6.) Pursuant to the Promissory Note, Debtor also agreed to pay Creditor 75% of its "Free Cash Flow," defined as Debtor's earnings from sales of water, crops, rents or other funds produced by the real property pledged as collateral for the Loan. (Rice Decl., ¶ 7.) In the event Debtor defaulted on this debt, including by failing to make any payment or perform any obligation, the Promissory Note provides that Creditor had the option of declaring all principal and accrued interest due and payable immediately. (Rice Decl., ¶ 7.) The Promissory Note also permits Creditor to recover from Debtor reasonable attorneys' fees and costs expended or incurred by Creditor in connection with the enforcement of its rights related to the Loan. (Rice Decl., ¶ 7.)

Also in connection with the Loan, the parties executed a written loan agreement (the "Loan Agreement"), which contains certain representations and warranties, as well as additional obligations of Debtor related to the indebtedness. (Rice Decl., ¶ 8, Exh. B.) The Loan Agreement provides that, if Debtor failed to make any payment within five (5) calendar days of its due date,

---

[2] PIK Interest refers to the payment of interest, in lieu of a cash payment, on the outstanding principal amount through principal additions, equal to the monthly rate of 9% per annum multiplied by the outstanding principal balance. (Rice Decl., ¶ 5.)

1  Creditor would assess a late charge equal to five cents ($0.05) for each dollar ($1.00) of such late
2  payment, which would be immediately due and payable. (Rice Decl., ¶ 8.) The Loan Agreement also
3  provides that, in the event of Debtor's default, the interest rate would increase by 3% per annum over
4  the Cash Interest rate and 3% per annum over the PIK Interest rate. (Rice Decl., ¶ 8.) Pursuant to the
5  Loan Agreement, Debtor also agreed to provide certain financial statements and other financial
6  documents, including but not limited to: an audited financial statement on an annual basis; a quarterly
7  financial statement; monthly reports regarding the amount of water sold and delivered from the
8  encumbered real property, and Debtor's tax returns. (Rice Decl., ¶ 8.) Further, Debtor agreed to
9  maintain a trailing 12-month minimum EBITDA of $2,000,000 as of December 31, 2018 and
10 thereafter. (*Id.*)

11         The Loan was also secured by a deed of trust ("Deed of Trust #1") in favor of Creditor
12 on certain real property owned by Stephen W. Sloan, a member of Debtor, commonly known as
13 Merced County Assessor's Parcel Numbers: 088-190-018; 090-130-028; 090-140-049; 090-140-048;
14 and 088-180-051 (the "Hamburg Ranch"). (Rice Decl., ¶ 9, Exh. C.) Mr. Sloan, along with Patti
15 Marie Harrill-Sloan, personally guaranteed Debtor's obligations to Creditor. (Rice Decl., ¶ 9.) To
16 further secure Debtor's obligations to Creditor, Mr. Sloan pledged the Hamburg Ranch by executing
17 an additional deed of trust ("Deed of Trust #2") (collectively with Promissory Note, Loan Agreement,
18 and Deed of Trust #1, the "Loan Documents") in favor of Creditor on certain real property owned by
19 Debtor, commonly known as Merced County Assessor's Parcel Numbers: 049-200-005; 049-200-020;
20 049-200-022; 049-200-019; 049-200-023; 049-200-017; 049-200-021; 049-200-024; 049-220-018;
21 049-200-025; 049-220-019; 049-220-016; 049-220-020; 049-240-017; 065-030-004; 049-220-015;
22 and 049-240-016 (the "4-S Property"). (Rice Decl., ¶ 10, Exh. D.) Both Deed of Trust #1 and Deed
23 of Trust #2 provide that the land pledged as security for the Loan have water rights, including the right
24 to "receive irrigation water from such sources, in such quantities, and at such times and locations as
25 are reasonably satisfactory for the purposes of farming in such quantities and at such times and
26 locations as has been historically conducted" on the property. (Rice Decl., ¶ 10.)

27 ///
28 ///

### B. Debtor's Defaults and Appraisals of Collateral.

Following execution of the Loan Documents, Debtor elected to convert Cash Interest to PIK Interest in lieu of making monthly payments for the first 12 months of the Loan. (Rice Decl., ¶ 11.) In or around August 2018, Cash Interest began to accrue at the regular rate and Debtor defaulted by failing to make regular monthly payments of all Cash Interest accrued. (Rice Decl., ¶ 11.) On or about October 19, 2018, Creditor sent Debtor a Default Letter (Rice Decl., ¶ 11, Exh. E.), declaring the entire indebtedness immediately due and payable. On or about November 15, 2018, Debtor made a one-time payment of $200,000.00, which Creditor applied to the outstanding Cash Interest accrued at the regular and default rates but did not cure the default. (Rice Decl., ¶ 11.)

Cash Interest and PIK Interest both continued to accrue on the principal balance at the default rate. (Rice Decl., ¶ 12.) Around this time, Debtor also defaulted on its obligations to Creditor by, in part, failing to deliver required reports, including audited financial statements and quarterly financial statements. (Rice Decl., ¶ 12.) Further, Debtor failed to meet its obligations under Section 4.15 of the Loan Agreement, which required a trailing 12-month minimum EBITDA of $2,000,000 as of December 31, 2018 and thereafter. (Rice Decl., ¶ 12.)

In light of Debtor's default, Creditor commissioned appraisals of the real property securing the Loan in late September 2019. (Rice Decl., ¶ 13.) Specifically, the firm of Edwards, Lien & Toso, Inc. performed an appraisal of the Hamburg Ranch and determined that the property has a fair market value of $12,520,000.00, as detailed in their report dated September 30, 2019. (Rice Decl., ¶ 13, Exh. F.) This firm also performed an appraisal of the 4-S Property and determined that it has a fair market value of $14,985,000.00, as detailed in their report dated October 24, 2019. (Rice Decl., ¶ 13, Exh. G.) Each of these appraisals, totaling $27,505,000.00, did not account for the speculative value of the water rights accompanying each property as detailed in Deed of Trust #1 and Deed of Trust #2. (Rice Decl., ¶ 13.) Creditor is not aware of any material changes to either the Hamburg Ranch or the 4-S Property since the appraisals were performed in late 2019. (Rice Decl., ¶ 13.)

///

///

///

**C. Forbearance Agreements.**

On or about May 13, 2019, Creditor and Debtor entered into a Loan Forbearance Agreement. (Rice Decl., ¶ 14, Exh. H.) That agreement was later amended and restated by virtue of the Amended and Restated Loan and Forbearance Agreement. (Rice Decl., ¶ 14, Exh. I.)

When Debtor failed to perform as agreed under the Loan Forbearance Agreement and under the Amended and Restated Loan and Forbearance Agreement, Creditor commenced non-judicial foreclosures of both Deed of Trust #1 and Deed of Trust #2. (Rice Decl., ¶ 15.)

On or about October 30, 2019, Creditor and Debtor, as well as Mr. Sloan and Ms. Harrill-Sloan, as guarantors, and Merced Falls Ranch, LLC ("MFR"), as an affiliate of Debtor, entered into a forbearance agreement (the "Forbearance Agreement"). (Rice Decl., ¶ 16, Exh. J.) Pursuant to the Forbearance Agreement, Creditor agreed to forbear from exercising its rights under the Loan Documents related to the indebtedness, which totaled approximately $50,717,835.57, until December 20, 2019. (Rice Decl., ¶ 17.) In exchange for this forbearance, which included postponing the Trustee's sales of the real property securing Deed of Trust #1 and Deed of Trust #2, Debtor agreed to pay a non-refundable forbearance fee of One Million Dollars ($1,000,000.00). (Rice Decl., ¶ 16.) Debtor did not make this payment to Creditor and did not perform as agreed in the Forbearance Agreement. (Rice Decl., ¶ 17.)

In or around December 2019, however, Debtor communicated that it would not be able to pay off the entire indebtedness by December 20, 2019, the end of the forbearance period. (Rice Decl., ¶ 18.) Accordingly, on or about December 18, 2019, the parties entered into an Amendment to Forbearance Agreement (the "Amendment"). (Rice Decl., ¶ 18, Exh. K.) Pursuant to the Amendment, Creditor agreed to further forbear from exercising its rights under the Loan Documents related to the indebtedness, which totaled approximately $53,171,128.78, until February 28, 2020. (Rice Decl., ¶ 18.) Debtor, in turn, agreed to make payments of $1,000,000.00, as a partial payment pursuant to the Loan Documents, and $1,000,000.00, as a further forbearance fee. (Rice Decl., ¶ 18.) Debtor did not make either of these payments to Creditor and did not perform as agreed in the Amendment to Forbearance Agreement. (Rice Decl., ¶ 18.)

///

**D.    Amount Due and Owing and Recent Procedural History.**

Prior to the commencement of this case, Creditor's foreclosure service, WT Capital Lender Services, had noticed foreclosure sales for both Deed of Trust #1 and Deed of Trust #2. Debtor commenced this case mere days before the sales were to take place. (Rice Decl., ¶ 19.) As of the date of commencement of the case, Debtor owed Creditor a total of $57,264,545.53 on the Loan, including: (1) a principal balance of $47,469,035.59, including PIK Interest; (2) Cash Interest accrued in the amount of $4,479,364.84; (3) default Cash Interest in the amount of $1,906,576.64; (4) late charges of $225,710.71; (5) attorneys' fees of $183,857.65; and (6) the forbearance fees pursuant to the Forbearance Agreement and Amendment in the amount of $3,000,000.00. (Rice Decl., ¶ 19, Exh. L.)

On March 2, 2020, Debtor filed its Petition and initiated the above-entitled bankruptcy proceeding. Mr. Sloan filed a Petition initiating a Chapter 11 bankruptcy proceeding the same day. (Rice Decl., ¶ 20.)

## II.

## LAW & ARGUMENT

**A.    Standards for Relief.**

On request of a party in interest, including a creditor, and after notice and a hearing, the Court shall grant relief from the automatic stay with respect to a stay of an act against property if: (A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2)(A)-(B).

The party seeking relief from stay has the burden of proving that the debtor has no equity in the personal property. 11 U.S.C. § 362(g)(1). The term "equity" is defined by bankruptcy courts as "the difference between the value of the property and all encumbrances upon it." *Stewart v. Gurley*, 745 F.2d 1194, 1195 (9th Cir. 1984).

Property is necessary for an effective reorganization if "the property is essential for an effective reorganization *that is in prospect*." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 376 (1988) (emphasis original). The debtor carries the burden when faced with a motion for relief from stay pursuant to 11 USC § 362(d)(2) and it is insufficient for a debtor to

merely show that "if there is conceivably to be an effective reorganization, this property will be needed for it…" *Id.* at 375. "Courts usually require the debtor to do more than manifest unsubstantiated hopes for a successful reorganization." *Sun Valley Newspapers v. Sun World Corp. (In re Sun Valley Newspapers),* 171 B.R. 71, 75 (9th Cir. BAP 1994). "Unless the debtor can demonstrate that the property is necessary to an effective reorganization, the property is of no value to him." *Stewart, supra,* 745 F.2d at 1196.

The Ninth Circuit Bankruptcy Appellate Panel has adopted a four-part test based upon the timing of the creditor's motion for relief: "'The four broad categories can be stated as follows: (1) is it *plausible* that a successful reorganization will occur within a reasonable time?; (2) is it *probable* that a successful reorganization will occur within a reasonable time?; (3) is it *assured* that a successful reorganization will soon occur?; or (4) is it *impossible* that a successful reorganization will occur within a reasonable time?'" *In re R.K. Best, Inc.*, 2013 Bankr. LEXIS 3247 at *14-15 (Bankr. E.D. Cal. 2013), quoting *In re Holly's, Inc.*, 140 B.R. 643, 700 (Bankr. W.D. Mich. 1992). Although bankruptcy courts demand "less detailed showings during the four months in which the debtor is given the exclusive right to put together a plan…even within that period lack of any realistic prospect of effective reorganization will require § 362(d)(2) relief." *Timbers of Inwood Forest Assocs, supra,* 484 U.S. at 376.

### B. Creditor is Entitled to Relief from Stay to Proceed Against the 4-S Property.

In over 30 months since Creditor made the Loan, Debtor has made only one (1) payment of $200,000.00, representing only a small portion of the Cash Interest accrued at that time and an even smaller fraction of the total amount due and owing. Despite Creditor's agreement to extend the repayment period to accommodate Debtor on several occasions, Debtor has failed to refinance or otherwise monetize the 4-S Property or the water to which it may have access. Debtor has no equity in the property, no effective reorganization is possible, and relief from stay should be granted to proceed with the foreclosure sale that would have occurred but for Debtor's bankruptcy filing.

///

///

### 1. Debtor Has No Equity in the 4-S Property

As of the date of commencement of the case, the total outstanding balance owed on the Loan was $57,264,545.53, including: (1) a principal balance of $47,469,035.59, including PIK Interest; (2) Cash Interest accrued in the amount of $4,479,364.84; (3) default Cash Interest in the amount of $1,906,576.74; (4) late charges of $225,710.71; (5) attorneys' fees of $183,857.65; and (6) the forbearance fees pursuant to the Forbearance Agreement and Amendment in the amount of $3,000,000.00. (Rice Decl., ¶ 18, Exh. L.) Debtor has not yet filed its Summary of Assets and Liabilities and provided an estimate of the 4-S Property's value. Creditor, however, commissioned an appraisal of the property less than 6 months ago, which determined that the 4-S Property has a fair market value of $14,985,000.00. (Rice Decl., ¶ 13, Exh. G.) This fair market value is just over 25% of the total outstanding Loan balance, without considering any other liens that may be encumbering the property. Even considering the fair market value of the Hamburg Ranch, pledged as collateral for the Loan by Mr. Sloan, the debtor in another recently-filed bankruptcy proceeding, the properties are only worth a collective $27,505,000.00. (Rice Decl., ¶ 13, Exh. F.) The value of Creditor's lien far exceeds the property's fair market value and Debtor has no equity in the 4-S Property.

### 2. Debtor Has No Realistic Prospect of a Reorganization.

Debtor cannot meet its burden as to the second prong of 11 USC § 362(d)(2), that the 4-S Property is necessary for an effective reorganization. In fact, it is impossible for Debtor to reorganize within a reasonable time, if at all.

As a preliminary matter, the Petition lists Debtor's total estimated liabilities as between $50 million and $100 million. (ECF No. 1.) Although it remains to be seen whether Debtor can substantiate its shocking estimate of assets of between $500 million and $1 billion, the Petition crucially admits that Debtor is a single asset real estate debtor, as defined in 11 USC § 101(51B). (ECF No. 1.) In other words, Debtor's only hope of a successful reorganization is to monetize or otherwise use the 4-S Property to generate revenue. There is simply no evidence that Debtor can accomplish this.

As detailed, *supra*, the 4-S Property has a fair market value of $14,985,000.00, which is only a fraction of Creditor's $57,264,545.53 lien on the property. (Rice Decl., ¶ 13, Exh. G.) In order

to refinance the property and pay off Creditor, Debtor would have to obtain financing with a loan-to-value ratio of over 200%. Even for non-traditional lenders specializing in rescuing troubled businesses, let alone traditional lenders that might provide financing at a lower interest rate, this refinance is well outside prevailing lending standards and highly unlikely. (Rice Decl., ¶ 21.) Debtor has no realistic hope of refinancing the property with another lender. Further, since the real property owned by Debtor has not generated any revenue since Creditor's loan was originated in August of 2017, it is even more unlikely that a lender would be inclined to refinance Debtor's obligations to Creditor. (*Id.*) This is simply not feasible, particularly in light of the fact that Creditor's claim in *this* proceeding arises from a non-traditional financing arrangement.

Debtor also cannot provide any concrete evidence that it will be able to generate sufficient revenue from the 4-S Property to support an effective reorganization. Debtor has controlled the 4-S Property for years. It has been over 30 months since Creditor made the Loan and Debtor has yet to make any substantial progress toward monetizing the water on the property. The last isolated water sales made by Debtor were several years ago and the Debtor has utterly failed in its efforts to commoditize its water on a large scale. This is true despite Creditor agreeing four times to extend the repayment period of the Loan, in order to permit Debtor to either cure its defaults or otherwise pay off Creditor. (Rice Decl., ¶¶ 14-18, Exhs. H - K.) Since the origination of this loan in August of 2017, Debtor has made only a single payment, over one (1) year ago, which did not even cover the Cash Interest that had accrued up to that point. (Rice Decl., ¶ 11.) Moreover, pursuant to the Promissory Note, Debtor agreed to pay 75% of its earnings from sales of water, crops, rents or other funds produced by the 4-S Property. (Rice Decl., ¶ 7.) Debtor has failed to make any such payment, either because it has failed to generate any such funds during this time, or because it has fraudulently withheld those funds from Creditor.[3]

Creditor anticipates that Debtor will contend that the water rights accompanying title to the 4-S Property are of immense value and will assist in a reorganization. This is dubious at best,

---

[3] Creditor would be able to discern why Debtor has failed to make any "Free Cash Flow" payments pursuant to the Promissory Note, but Debtor has refused to provide necessary financial documents, including audited financial statements; quarterly financial statements; monthly reports regarding the amount of water sold and delivered from the encumbered real property; and Debtor's tax returns. (Rice Decl., ¶ 8.) This failure violates the explicit terms of the Promissory Note.

particularly in light of the fact that Debtor, other than engaging in isolated sales transactions, has been unable to execute its plan to commoditize its water. The appraisals commissioned by Creditor do not ascribe any value to the speculative water rights on which Debtor hinges its value assumption. (Rice Decl., ¶ 13.) In this regulatory climate, and with the Sustainable Groundwater Management Act restricting pumping of groundwater on Debtor's land, which is located in a "critically overdrafted" portion of the state, Debtor simply cannot demonstrate that these water rights can be monetized in a manner sufficient to support a reorganization.

In short, Debtor has had control of the 4-S Property, without the burden of making consistent or significant payments on the Loan, for years. Debtor has failed to derive any revenue from the property, much less revenue sufficient to pay off or refinance the loan, or provide any evidence that it will generate any revenues in the future. More importantly, Debtor has failed to demonstrate any evidence that an effective reorganization is even possible. The 4-S Property should be liquidated and Creditor should be granted relief from stay to proceed with the scheduled foreclosure sale.

### III.

### **CONCLUSION**

Based on the foregoing, Creditor respectfully requests that this Court grant its request for relief from stay.

WHEREFORE, Creditor respectfully prays for an Order from this Court as follows:

1. Terminating the automatic stay of 11 U.S.C. § 362, as it applies to Creditor's efforts to proceed against the 4-S Property; and

2. For such other and further relief as the Court deems just and proper.

DATED: MARCH 16, 2020            WANGER JONES HELSLEY PC

By:_____/s/ Steven K. Vote_____
Kurt F. Vote
Steven K. Vote
Attorneys for Creditor
Sandton Credit Solutions Master Fund IV, LP