**19**

1
2   MACDONALD | FERNANDEZ LLP
    RENO F.R. FERNANDEZ III (SBN 251934)
3   ALEXANDER K. LEE (SBN 293724)
    914 Thirteenth Street
4   Modesto, CA 95354
    Telephone: (209) 521-8100
5   Facsimile: (415) 394-5544

6   Attorneys for Debtor in Possession,
    4-S RANCH PARTNERS, LLC

7

8                    UNITED STATES BANKRUPTCY COURT

9          EASTERN DISTRICT OF CALIFORNIA - FRESNO DIVISION

10  In Re:                              Case No.    20-10800-B-11

11  4-S RANCH PARTNERS, LLC,            Chapter 11

12                  Debtor.             DCN:    MF - 9

13                                      DISCLOSURE STATEMENT FOR PLAN
                                        OF REORGANIZATION OF 4-S RANCH
14                                      PARTNERS, LLC DATED AUGUST 18,
                                        2020
15
                                        Hearing on Disclosure Statement
16                                      Date:
                                        Time:
17                                      Place:    2500 Tulare Street
                                                  Courtroom 13
18                                                Fresno, California
                                        Judge:    Hon. René Lastreto II
19

**I.   INTRODUCTION**

20
            4-S Ranch Partners, LLC, the Debtor in Possession ("Debtor," "4-S," or the "Debtor in
21
    Possession"), has proposed the accompanying Plan of Reorganization dated August 18, 2020 for
22
    consideration by its creditors and interested parties. This Disclosure Statement is presented to provide
23
    creditors and interested parties with adequate information, as understood by title 11 of the United State
24
    Code, about 4-S, the alternatives available for their repayment and the proposed Plan of
25
    Reorganization dated August 18, 2020. 4-S believes that its Plan of Reorganization (the "Plan") offers
26
    the most expeditious and effective mechanism to pay its creditors. Please note that the Debtor
27
    previously obtained approval of its Disclosure Statement in Support of the Plan of Reorganization
28
    Dated July 13, 2020 (Dckt. No. 157; DCN MF-3). The hearing on the Plan of Reorganization dated

                                                                                    1

1   July 13, 2020 was set for a confirmation hearing on September 29, 2020 at 9:30 a.m. However, Debtor

2   was recently informed that the Merced County Tax Collector will be amending its proof of claim to

3   reflect an entirely secured claim rather than an unsecured priority tax claim. As a result, the Debtor

4   needed to conduct substantive modifications to its proposed Plan that necessitates additional

5   disclosures under 11 U.S.C. Section 1125.

6   **II.**     SUMMARY OF PLAN TREATMENT

7      4-S's principal asset is real property commonly known as known as Merced County Assessor's

8   Parcel Numbers: 049-200-005; 049-200-020; 049-200-022; 049-200-019; 049-200-023; 049-200-017;

9   049-200-021; 049-200-024; 049-220-018; 049-200-025; 049-220-019; 049-220-016; 049-220-020;

10   049-240-017; 065-030-004; 049-220-015; and 049-240-016, located on the at the north and south sides

11   of Green House Road, ± 1.5 miles west of Dan McNamara Road, southwest of Atwater, Merced

12   County, California (the "Property"). The Plan centers upon the disposition of the Property for the

13   benefit creditors, other parties in interest, 4-S, and others that may benefit from certain dispositions of

14   the Property. The Plan requires 4-S to secure new capital or new financing, or to sell the Property, all

15   subject to the approval of the United States Bankruptcy Court for the Eastern District of California. 4-

16   S is pursuing new capital or new financing in a multipronged approach the includes selling interest in

17   the Property and/or signing long term water contracts before refinancing the secured claim on the

18   Property. If 4-S can secure new capital or new financing to satisfy the claims of holders of claims in

19   Class 1, Class 2, and Class 3 (as directed by holders for Class 3) within one year of the effective date

20   of the plan, then 4-S need not sell part or all of the Property. Through one of those means, i.e., new

21   capital, new financing, or a sale of the Property, the Plan provides for the payments to the following

22   class of claims:

23        *Class 1:*     The Allowed Secured Claim of Merced County Tax Collector, which is

24        secured by a tax lien encumbering the Property.

25        *Class 2:*     The Allowed Secured Claim of Sandton Credit Solutions Master Fund

26        IV, LP.

27        *Class 3:*     The Claims of general unsecured creditors of the Debtor, to the extent

28        they may be Allowed, which are not otherwise classified herein

2

Class 4:        The Equity Interests of Shareholder of the Debtor

On the first anniversary of the Plan's Effective Date, 4-S shall fund all payments required to be made on the Effective Date through new capital, new financing or the proceeds of a sale of the Property, all of which are subject to approval of the Bankruptcy Court (the "Liquidity Event").

The Debtor is of the view that each of these classes are impaired, and thus, the holders of claims in those classes are entitled to vote on the Plan.

## III.    BACKGROUND

In 2009, the Property was purchased by Merced Falls Ranch, LLC. Diversion and use statements have been filed with and accepted by the State Water Resources Control Board ("Water Board") for all four of the natural and manmade river courses on the Property for the period of 2009 through 2018. The 2019 diversion and use statements are currently pending.

In 2013, the Property was purchased by 4-S with financing from NORTH STAR INVESTMENT HOLDINGS LLC ("North Star") that was secured in the Property. Subsequently, in 2014, 4-S agreed to water supply contract with Del Puerto Water District ("DWPD") for a two-year period. From October 1, 2014 until October 1, 2016, 4-S sold up to 11,000 acre-feet of groundwater per a year to the Del Puerto Water District ("DPWD") at a contract rate of $600 per an acre-foot or $750 per an acre-foot depending whether or not the Patterson Irrigation District was used as a source of diversion.

The passage of the Sustainable Groundwater Management Act ("SGMA") in 2014 substantially changed 4-S's business operations. 4-S has been rigorously working to shift the operation of its business from the sale of groundwater to storage of client water underground, and sale of stored surplus surface water from the Property for sale through long term contracts.

In 2017, 4-S obtained a loan from Sandton Credit Solutions Master Fund IV, LP ("Sandton"), to refinance the debt owed to North Star to allow for the continued improvement of the Property to operate under the SGMA regulations that have been gradually implemented. The Sandton loan is secured in the Property, and the real property commonly known as Merced County Assessor's Parcel Numbers: 088-190-018; 090-130-028; 090-140-049; 090-140-048; and 088-180-051 (the "Hamburg Ranch"), which is not property of 4-S's estate as it is owned by Stephen W. Sloan ("Sloan") Santon's

1    secured debt is also subject personal guarantees of Sloan and Patti Marie Harrill-Sloan ("Harrill-

2    Sloan").

3          In 2018, the loan with Sandton went into default. 4-S and Sandton negotiated two forbearance

4    agreements that were each amended once. The Sandton loan became due and payable in 2019 and

5    Sandton refused to grant any further forbearance agreements. A foreclosure sale was scheduled for

6    March 4, 2020. This Chapter 11 case was commenced to prevent that foreclosure sale.

7          On March 2, 2020, in order to prevent the foreclosure sale of the Property and certain other

8    real property owned directly by Sloan, 4-S and Sloan filed voluntary petitions for reorganization under

9    Chapter 11 of the Bankruptcy Code, and were assigned cases numbered 20-10800 and 20-10809,

10   respectively.

11         Subsequently, on March 16, 2020, Sandton filed motions for relief from the automatic stay

12   ("Relief Motions") in this case and Sloan's personal case. 4-S and Sloan filed oppositions to the Relief

13   Motions. At the initial hearing, the Court determined that Relief Motions were contested matters and

14   set the matter for an evidentiary hearing to determine factual issues regarding the value of the real

15   property securing the Sandton loan and whether the respective cases may realistically produce

16   sufficient revenue for effective reorganization. The evidentiary hearings for the cases were

17   consolidated and set for trial on September 17, 2020. The underlying cases have not been consolidated

18   and are not jointly administered.

19         Sandton's Relief Motions allege that they are entitled from relief from the automatic stay under

20   11 U.S.C. § 362(d)(2). Relief requested under §362(d)(2) requires a showing that the debtor does not

21   have equity in the property relief is sought against and the property is not necessary for an effective

22   reorganization. 11 U.S.C. §362(d)(2)(A)-(B). At the early stages of a Chapter 11 case, the burden is

23   upon the debtor to offer sufficient evidence to indicate that a successful reorganization within a

24   reasonable time is plausible. Near the expiration of the exclusivity period, debtors must demonstrate

25   that a successful reorganization within a reasonable time is probable. After the expiration of the

26   exclusivity period, debtors must demonstrate that it is assured a successful reorganization will occur

27   within a reasonable time. However, regardless of a time a case has been pending, if evidence indicates

28   that it is impossible for reorganization to occur within a reasonable time, relief from the automatic stay

4

should be granted. *Sun Valley Newspapers v. Sun World Corp.* (*In re Sun Valley Newspapers, Inc.*), 171 B.R. 71, 75 (9th Cir. BAP 1994), quoting *In re Holly's, Inc.*, 140 B.R. 643, 700 (Bankr. W.D. Mich. 1992); See also *In re R.K. Best, Inc.*, 2013 WL 4050998 at *4-5 (Bankr. E.D. Cal. 2013).

4-S is a single asset real estate case, as such, substantially all its income will be generated from the business of operating the Property and activities incidental. If Sandton's Relief Motions are successful, 4-S will not be able to effectuate the Plan because the automatic stay will be lifted as to the Property and subsequent foreclosure will eliminate 4-S ability to fund the Plan. Further, Sandton would have proven that the Property does not have equity to support their secured claim resulting in diminished payments to unsecured creditors. 4-S believes that a foreclosure of the Property will be akin to an expedited liquidation of the estate resulting in diminished payments to unsecured creditors compared to 4-S operating as an ongoing concern. The Liquidation Alternative section below and Exhibit "A" attached hereto contains liquidation analyses based upon Sandton's asserted value for the Property.

However, confirmation of the Plan may greatly diminish Sandton's ability to succeed on Relief Motions even if there is a lack of equity based upon a liquidation or foreclosure valuation. When a debtor submits a proposed plan before the final hearing on the motion to lift the automatic stay under 11 U.S.C. § 362(d)(2), determination that the plan is not patently unconfirmable is a prerequisite to denial of the relief motion. *In re 499 W. Warren Street Associates, LT. Partnership*, 151 B.R. 307, 310 (Bankr. N.D.N.Y 1992) (citations omitted) (after multiple attempts by the debtor to confirm a plan, the last proposed plan was patently unconfirmable due to violations of 11 U.S.C. § 1129 and the court granted relief from the automatic stay). While Plan confirmation is determined upon different criteria than 11 U.S.C. § 362(d)(2), if the Plan meets the requirements for confirmation, it gives substantial support that the Property is necessary to effective reorganization. Therefore, if the Plan is confirmed prior to the final hearing on the Relief Motion, Sandton might not be granted relief from the automatic stay as the Plan was not patently unconfirmable and the Property is necessary for an effective reorganization.

The Property has been improved to operate as a water banking facility that stores surface water underground in eighteen (18) wells with a storage capacity of estimated at 500,000 acre feet of water

and a capacity to deliver 50,000 acre feet of water per a year. 4-S is pending approval of one final diversion and use statement and temporary water permits from the Water Board to allow for the pumping of stored surface water back into the system. On a concurrent path, 4-S has applied with the Local Agency Formation Commission of Merced County ("LAFCO") to form the Owens Creek Water District ("Owens Creek Application") to attain public agency status for the purposes of managing groundwater resources with the proposed district in compliance with SGMA and becoming a Groundwater Sustainability Agency ("GSA"). The COVID-19 Pandemic has caused delays to the processing of the statement of diversion, and the application to create a water district, but 4-S anticipates receiving the respective approvals shortly.

After some input from LAFCO, 4-S recently gave a presentation to LAFCO on the Petition for the Creation of Owens Creek Water District at the July 2020 meeting agenda for approval review. Absent further delays caused by the COVID-19 Pandemic and input from LAFCO, the formal Owens Creek Application is estimated to be placed on the October 2020 meeting agenda for approval review by the full board. The formation of a GSA after approval of the Owens Creek Application will take an estimated ninety to hundred and twenty days with the possibility of more delays caused by the COVID-19 Pandemic. Formation of a GSA will allow 4-S greater flexibility in sale of water because the agency can use the powers and authorities under Chapter 5 of SGMA to provide a maximum degree of local control and flexibility consistent with the groundwater sustainability goals of SGMA. 4-S believes that the formation of the GSA will open additional opportunities to sell water beyond the current proposed practice of selling stored abandoned, or salvaged flood flows.

4-S also recently engaged the United States Bureau of Reclamation to be certified to accept water from the Central Valley Project ("CVP") for storage. Absent further delays caused by the COVID-19 Pandemic, 4-S estimates that it can be certified as a water banking facility for CVP within ninety to hundred and twenty days and start taking on storage contracts shortly after. The ability to store water for CVP will provide an enhancement in value because it will allow 4-S to enter contracts to store water in surplus years for both districts and individuals.

4-S continues to diligently negotiate with water districts and individual water purchasers for long term water supply contracts that can be signed prior to obtaining the final statement of diversion

and temporary water permits or the approval for the creation of a water district. In fact, 4-S has recently signed contracts to provide 5,000 acre feet of water and 2,000 acre feet of water a year to two separate purchasers. Further, 4-S has obtained approval from the water acquisition committee of Westlands Water District ("WWD") for an agreement to provide 25,000 acre feet of water. 4-S is in the final stages of negotiation and approval of the pricing scheduled by the WWD's board of directors. Discussions have been going on regarding pricing schedules based upon CVP allocations. 4-S believes that the commitments for 7,000 acre feet of water and the pending 25,000 acre feet agreement along with WWD will be sufficient to obtain a refinancing from Citizens Business Bank sufficient to payoff all allowed claims.

Portions of 4-S's administrative expenses may be funded by non-debtor affiliate, Sloan Cattle Company, LLC ("Sloan Cattle"). Sloan Cattle is a California Limited Liability Company that is owned 50% by Sloan and 50% by Sloan's son, Brett Sloan. Sloan is the sole manager of Sloan Cattle. Brett Sloan serves as Sloan Cattle's chief executive officer.

4-S files this disclosure statement and accompanying Plan in an effort to maximize and realize the full value of the Property.

## IV.    SUMMARY OF PLAN

**DISCLAIMER:** Any reference of claim amounts asserted by creditors does not signify 4-S's agreement that the amounts are owed. Any amount asserted is subject to the claims allowance and disallowance process of the Bankruptcy Code. The court has not yet confirmed the plan described in this disclosure statement. The terms of the plan are not yet binding on anyone. However, if the court later confirms the plan, then the plan will be binding on the debtor and on all creditors and interest holders in this case. Furthermore, no statements of information concerning the Debtor or its assets are authorized other than those set forth in this Disclosure Statement.

### i.    Administrative Claims

Debts incurred after the commencement of the bankruptcy case are ordinarily referred to as "expenses of administration" or "administrative claims." Administrative claims have priority over general unsecured claims and must be paid in cash, in full, promptly after the confirmation of a Plan of Reorganization. In this case, administrative claims potentially fall into two categories.

**First**, professional fees incurred by the bankruptcy estate are entitled to administrative claim priority to the extent those fees are approved by the Bankruptcy Court. As of the date of this document, the only professionals employed by 4-S's bankruptcy estate are its general counsel, expert witness, hydrogeological consultant, and rebuttal expert witnesses. 4-S's professionals and their current estimated are as follows:

| Professional | Role | Estimated Fees (subject to Court approval and standard of the Bankruptcy Code) |
|---|---|---|
| Macdonald Fernandez LLP | General Ch. 11 Counsel | Estimated $50,000 (net of retainer) |
| Lance Doré, The Doré Group | Expert Appraiser Witness | Estimated $50,000 maximum cost to be paid by Sloan Cattle without additional approval by Debtor and Sloan Cattle |
| Dwight Smith, McGinley and Associates* | Hydrogeologist Consultant Conducting a Geochemical Evaluation | Estimated $20,000 to be paid by Sloan Cattle ($8,000 retainer paid by Sloan Cattle on or about May 19, 2020) |
| Dwight Smith, McGinley and Associates* | Rebuttal Hydrogeologist Expert | Estimated $25,000 to be paid by Sloan Cattle |
| Joseph Hughes, Klein, DeNatale, Goldner* | Rebuttal Water Law Expert | Estimated $15,000 to be paid by Sloan Cattle |

*Please note that as of the date of this document, the 4-S has not yet obtained approval for employment of these professionals. Mr. Smith and Mr. Hughes were recently retained to serve as rebuttal witnesses. The application to seek authority to employ Mr. Hughes as a rebuttal witness has been filed as Docket 170. The application to seek authority for Mr. Smith's employment as a rebuttal witness will be filed shortly. A motion for *nunc pro tunc* authority to employ Mr. Smith for his hydrogeological consulting work was filed as Docket 162.

**Second**, administrative expense priority is afforded to debts which the bankruptcy estate incurs following the commencement of its case in the ordinary course of its business, whether with respect to preserving, protecting, leasing or selling the Property (e.g., utilities, security, leasing commissions) or prosecuting the bankruptcy case (e.g. U.S. Trustee fees). 4-S believes that the only such expenses it is likely to incur is U.S. Trustee fees.

The Plan contemplates that the first category of administrative expense, i.e., professional fees,

8

shall receive the cash equivalent of their claim on or promptly after the Effective Date of the Plan.

The Plan contemplates that the second category, effectively the United State Trustee's fees, if any are unsatisfied, shall receive cash equal to the fees, and that any such fee accrued between the period of the Confirmation Date and the entry of the Final Decree shall be paid by 4-S promptly.

### ii.  Priority Taxes

4-S is only aware of one priority tax claims. The California Franchise Tax Board ("FTB") claims a priority tax claim in the amount of $800.00 as evidenced by proof of claim number 3 on the Court's claim register ("CCR"). Under the Plan, the priority tax claims, as ultimately allowed, will be paid in full with interest from the through the proceeds of the liquidity event, which is the sale of all or a portion of the Property not later than the first anniversary of the Effective Date (the "Liquidity Event"), unless they have previously been paid. The priority tax claim of FTB is unimpaired, and as a consequence is not permitted to vote on the Plan.

### iii.  Class 1: Secured Claim Vis-à-vis Real Property Taxes

The Merced County Tax Collector filed a proof of claim based on real property taxes. The Merced Count Tax Collector assets a claim in the total amount of $396,700.28 as secured upon the property, and an unsecured priority claim under Section 507(a)(8) in the same amount. 4-S listed the Merced County Tax Collector on its Schedule E/F as holding an unsecured priority claim in the amount of $367,884.48. However, on August 18, 2020, Merced County Tax Collector informed 4-S's counsel that it would be amending its proof of claim to reflect only a secured claim in the amount of $396,700.68. Class 1 only pertains to the secured claim of Merced County Tax Collector. The Plan provides that the Class 1's security interest in the Property will be retained. The Plan also provides that Class 1 will receive such cash equal to its allowed claim, together with interest at a rate contemplated by Section 511 of the Bankruptcy Code, through the proceeds of the Liquidity Event. The Plan also provides that 4-S need not sell the Property if it can otherwise provide for the satisfaction of this Claim (and claims in Class 2 and Class 3) prior to the first anniversary of the Effective Date.

Holder of the claim in Class 1 is impaired, and therefore, is entitled to vote to accept or reject 4-S's Plan.

///

9

#### iv.  **Class 2: Secured Claim of Sandton Credit Solutions Master Fund IV, LP**

Class 2 consists of the allowed secured claim of Sandton secured upon the Property. 4-S's Schedule D represents that such claim is in the amount of $57,264,645.50 as of the petition date. The Plan provides that the Class 2's security interest in the Property will be retained, that it shall be given a lien in the proceeds from the Liquidity Event, that if its claim is not paid in full from the Liquidity Event, then the Court shall condition the Liquidity Event on such terms as may be appropriate to afford the holder of the Class 2 Claim adequate protection of its interest in the Property. The Plan also provides that 4-S need not sell all or part of the Property if it can otherwise provide for the satisfaction of this Claim (and claims in Class 1 and Class 3) prior to the first anniversary of the Effective Date. The Plan provides that the interest rate for the holder of claims in Class 2 is the rate of interest equal to one-month London Interbank Bank Offered Rate plus 4.5% with a floor rate of 5.75% or the interest rate permissible under § 506 of the Bankruptcy Code.

Holder of the claim in Class 2 is impaired, and therefore, is entitled to vote to accept or reject 4-S's Plan.

#### v.  **Class 3: General Unsecured Claims**

The claims of general unsecured creditors are assigned to Class 3 under the plan. The Chart below identified unsecured debt based on the Debtor's Schedule E/F and claimants who filed proofs of claims:

| #  | Creditor | Scheduled Unsecured Amount | Proof of Claim ("POC") Filed? | POC Amount as Unsecured |
|----|----------|----------------------------|-------------------------------|-------------------------|
| 1  | PG&E | $405,186.02 | No | - |
| 2  | Rodarakis & Sousa, APC | $93,440.94 | No | - |
| 3  | O'Laughlin & Paris LLP | $31,800.00 | No | - |
| 4  | Shannon Pump Co. | $11,495.90 | No | - |
| 5  | O. Ray Sheets Accountancy Corporation | $7,229.91 | No | - |
| 6  | Wendel Rosen LLP | $2,280.00 | Yes | $2,280.00 |
| 7  | Corporation Service Company | - | Yes | $470.00 |
|    | Total: | $551,432.77 | | $2,750.00 |

1    Under the Plan, claims constituting Class shall receive a ratable distribution of the net proceeds
2    from the sale of the Property one year after the Liquidity Event after, of course, the Class 1 claim is
3    satisfied. The Plan also provides that that 4-S need not sell all or part the Property if it can otherwise
4    provide for the satisfaction of claims in Class 3 (and claims in Class 1 and Class 2) prior to the first
5    anniversary of the Effective Date.

6    Notably, because the Plan rejects all the 4-S's executory contracts and unexpired lease, the
7    pool of unsecured claims may increase. A counter-party to a rejected executory contract or a rejected
8    unexpired lease must file their claims for damages, if any, not later than the 30th day following
9    confirmation of the Plan. The Plan also provides that the interest rate of holders of claims in Class 2
10   is federal judgment rate calculated under 28 U.S.C. § 1961 if the Debtor is solvent, but if the Debtor
11   is not solvent, then the interest rate of holders of claims in Class 2 is zero percent. The Debtor notes
12   that its schedules of assets and liabilities show that the value of its assets exceed its liabilities.

13   Holders of the claims in Class 3 are impaired, and therefore, are entitled to vote to accept or
14   reject 4-S's Plan.

15   **vi.     Class 4: Equity Interests**

16   Class 4 is composed of Sloan, the sole and managing member of 4-S. The Plan provides that
17   the holder of interest in Class 4 shall neither receive nor retain anything on account of their Interests
18   in the Debtor unless all of the Allowed Claims from Classes 1, 2 and 3 have been paid in full, with
19   interest.

20   Holder of interest in Class 4 impaired, and therefore, is entitled to vote to accept or reject 4-
21   S's Plan.

22   **vii.    Post-Confirmation Reporting**

23   Not later than 90 days after the entry of the Confirmation Order and quarterly thereafter, 4-S
24   shall file a quarterly post-confirmation status report. The purpose of the report is to explain the
25   progress made toward substantial consummation of the confirmed Plan. The Quarterly reports shall
26   be filed no later than 30 days following the end of the applicable calendar quarter.

27   ///

28   ///

## V.    TAX CONSEQUENCES

**DISCLAIMER**: 4-S cannot and does not represent that the tax consequences contained above are the only tax consequences of the Plan because 4-S cannot provide tax advice to Creditors. The tax laws embody many complicated rules which render it difficult to state completely and accurately all tax implications of any action. Creditors and parties in interest are urged to obtain and rely upon the advice of their tax professionals about the tax consequences of the Plan. The above disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues this Plan may present to the 4-S.

The 4-S is of the view there will be neutral tax consequences from a joint venture or additional capital contribution. From the perspective of 4-S and of the creditors, the payments made under the Plan will likely have precisely the same tax attributes and consequences as they would have had, if the claims had been timely paid in absences of the bankruptcy case. Any payments by 4-S that otherwise would have been taxable income to the creditor when received, will be taxable income when made under the plan. The tax consequences may differ under two circumstances. First, payments may be made or received in a different tax year because of the deferrals provided by the bankruptcy process, which may impact certain taxpayers. Second, there will likely be tax consequences to any creditors that have already taken a bad debt deduction with respect of any obligation of 4-S when the obligation is paid under the Plan.

In the event of a sale of the Property, 4-S does believe that there will be capital gains. However, tax consequences will have to be specifically determined based upon any agreed upon sale price of the Property approved by the Court. 4-S is a pass-through entity and taxes resulting from the sale of assets will fall to 4-S's sole member, Sloan.

## VI.    RISK FACTORS

The Debtor believes the structure of the Plan permits a path that imposes lesser risk to realize and maximize the value of the Property for all interests. As it is structured, if new capital or new financing fails to satisfy the claims of creditors, and fails to obtain court approval, then an orderly sale of the property will occur within a reasonable amount of time. There is a risk that the efforts of 4-S to obtain new capital, new financing, or sell the property will fail. In that situation, the Plan provides that

1    if 4-S fails to consummate the Liquidity Event by the first anniversary of the Effective Date, Sandton
2    may exercise all of its rights and remedies against the Property, unless the Court for cause orders
3    otherwise. 4-S is also required under the terms of the Plan to file quarterly post-conformation reports
4    to explain progress toward substantial consummation of the confirmed Plan, which will allow
5    Creditors and parties in interest to monitor 4-S's progress.

6    **VII.    LIQUIDATION ALTERNATIVE**

7            The Property, associated water, and wells are not fully liquid, and their full value will likely
8    not be realized if sold quickly. 4-S believes that a relatively prompt sale of the Property would not
9    yield any recovery in excess of the costs of the sale and payment on account of the secured debts
10   encumbering the Property because the sale would not be able to leverage the extensive contacts 4-S
11   has within the water banking and sales industry, and ongoing negotiations that have taken a significant
12   period of time to establish.

13           To provide all creditors adequate information to allow them to make an informed decision on
14   the proposed terms of the Plan, 4-S has included liquidation analyses offered as Exhibit "A" hereto.
15   The analyses provide alternative liquidation calculations based upon the values asserted by 4-S and
16   the value of the Property asserted by Sandton.  As Sandton's valuation is based upon an appraisal that
17   does not contain separate values for all associated or appurtenant water, water rights, water-related
18   assets and water interest of the Property, it is included in the liquidation analyses as a representation
19   of a hypothetical minimal liquidation value. *See Declaration of Robert Rice in Support of Motion for*
20   *Relief from Stay*, Dckt. No. 23, ¶ 13; *Exhibits to Declaration of Robert Rice in Support of Motion for*
21   *Relief from Stay*, Dckt. Nos. 29-30, Exhibit "G".  Additionally, the analyses include alternative
22   liquidation calculations based upon the inclusion of some of the assets that may not be fixtures of the
23   Property as discussed in more detail below.

24           The 500,000 acre-foot of stored water inventory listed on 4-S's Schedule A/B is not a liquid
25   asset that can be freely sold on an open market. The water inventory is appurtenant to the Property.
26   The collection, storage, and sale of water is tied to the rights associated with the ownership of the
27   Property. To realize the value of the water inventory, the Property must be operated as an ongoing

28

13

concern with proper permitting from the Water Board for the supply of stored water after contract(s) for sale have been signed.

Even if possible, an expedited liquidation of the water inventory over a short period of time will not net the same value as asserted by 4-S in the Schedules. During different times of the year, there are varying levels of demand for water that directly impact the price of water sold. The value asserted by 4-S on Schedule A/B is based upon the value of long-term supply contracts rather than a quick sale. Long-term water supply contracts address the ebbs and flows of water demand with a set price that is a negotiated compromise between the prices obtainable during the highest demand and lowest demand periods.

Further, it will be difficult for a trustee conducting a liquidation to find purchasers with the capacity to store such significant amounts of water for immediate delivery. Water districts have been interested in storing water on the Property due to the lack of suitable storage. Purchasers of water are not likely willing to take on large amounts of water all at once and would seek supply contracts to avoid the cost of creating or leasing additional water storage facilities. Therefore, 4-S believes that in a hypothetical Chapter 7 liquidation, the water inventory will be sold along with the Property without its own liquidation value.

The wells on the Property ("Wells") valued on Schedule A/B at $1,807,568.00 are not personal property equipment that can be removed from the land to be sold to individual buyers. The Wells were dug as permanent fixtures to Property and are uniquely suited for use as part of a mostly interconnected water storage and delivery system on the realty. Removal of the Wells is impractical and will likely result in significant damage to the Wells and Property. As a result, the Wells that have no value in liquidation outside of the value that can be received for the Property.

The water delivery systems and well equipment listed on Schedule A/B have been similarly annexed to the Property as they were intended to be a permanent part of the system of Wells. Water pipes and pumps have been held to be fixtures of real property when they are intended to be installed upon said property permanently as part of an interconnected system. *See Bell v. Bank of Perris*, 52 Cal.App.2d 66, 76 (1942) (pumps installed on concrete slabs, enclosed in specially constructed pump houses on the realty that became an integral part of an interconnected irrigation system on the without

1. which the ranch could not be operated were determined to be fixtures that passed to a mortgagee who
2. purchased the real property at foreclosure sale); *Robinson v. City of Glendale*, 182 Cal. 211, 213 (1920)
3. ("Where pipes are laid in real estate for the purpose of carrying water to the lands to which they extend,
4. the pipes while imbedded in the soil constitute real property both before the water is carried therein
5. and after the use for that purpose has cased."). Further, Sandton's Deed of Trust includes a lien on all
6. land improvements, including, without limitation, building improvements, stockwater equipment
7. located on or used in connection with the Property, enclosures of the Property, and electric, gas and
8. water lines and equipment located on the Property. *See Exhibits to Declaration of Robert Rice in*
9. *Support of Motion for Relief from Stay*, Dckt. No. 26, Exhibit "D". 4-S provided values for the water
10. delivery system and well equipment on Schedule A/B, but do not believe they have liquidation value
11. outside of the value of the Property. However, values for the water delivery system and well equipment
12. are included in alternative liquidation analyses in Exhibit A to demonstrate the possible impact on
13. liquidation should said assets be determined not to be fixtures of the Property during liquidation.

14.      Lastly, while Sandton's secured claim is cross-collateralized in Hamburg Ranch and is
15. personally guaranteed by Sloan and Harrill-Sloan, 4-S believes there will be a significant deficiency
16. claim should liquidation of the Property occur on an expedited basis. Any balance of the Sandton's
17. secured claim after the liquidation of the Property would likely be assessed against Sloan's estate,
18. which includes Hamburg Ranch. If Sandton's asserted values represent the liquidation value of the
19. Property, Sloan's estate does not contain sufficient assets to pay off the remaining balance of Sandton's
20. secured claim. 4-S is not certain if non-community property assets held by Harrill-Sloan are sufficient
21. to satisfy the amounts owed to Sandton if the assets of Sloan's bankruptcy estate are insufficient.
22. Therefore, based upon Sandton's valuation and the $36,582,005.434 in assets listed on Sloan's
23. schedules, there could be a deficiency claim of up to $6,896,440.07.

24.      Due the inability to fully realize the value of the Property as an ongoing concern in a
25. liquidation, 4-S believes that any trustee sale of the Property would yield a fraction of the market value
26. of the Property. Based upon the forgoing, in a liquidation, there would likely be minimal, if any,
27. payments to general unsecured creditors.
28. ///

1    ## VIII. CONCLUSION

2         4-S believes that the Plan offers the best alternative for the highest and fastest recovery for

3    creditors. Thus, 4-S believes that the Plan is in the best interests of the Debtor's estate, creditors, and

4    other interested parties.

5
     DATED:        August 28, 2020                          4-S RANCH PARTNERS, LLC.
6

7

8                                                     By: _____
                                                              Stephen Sloan
9
     Presented by:
10
     MACDONALD | FERNANDEZ LLP
11

12

13   By: /s/ Alexander K. Lee
             Reno F.R. Fernandez III
14           Alexander K. Lee
             Counsel for the Debtor in Possession
15           4-S RANCH PARTNERS, LLC

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                                                              16

1   **VIII.    CONCLUSION**

2       4-S believes that the Plan offers the best alternative for the highest and fastest recovery for

3   creditors. Thus, 4-S believes that the Plan is in the best interests of the Debtor's estate, creditors, and

4   other interested parties.

5

6   DATED:        August 28, 2020                    4-S RANCH PARTNERS, LLC.

7

8                                                    By: _____

                                                            Stephen Sloan
9

10  Presented by:

    MACDONALD | FERNANDEZ LLP
11

12

13  By: _____

            Reno F.R. Fernandez III
14          Alexander K. Lee
            Counsel for the Debtor in Possession
15          4-S RANCH PARTNERS, LLC

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                                                          16

# EXHIBIT A

## 4-S Ranch Partners, LLC's Asserted Values

**Assets**

| | | |
|---|---|---|
| Cash on Hand | | $0.00 |
| Accounts Receivable | | $0.00 |
| Inventory | Water Inventory | $200,000,000.00 |
| Machinery, Equipment, and Vehicles | | |
| | 1996 Case Backhoe Loader | $26,308.10 |
| | Wells | $1,807,568.00 |
| | Water Delivery System | $248,767.92 |
| | Well Equipment | $492,351.25 |
| Real Property | | |
| | 4-S Ranch ("Property") | $500,000,000.00 |
| Interest in Insurance Policies or Annuities | | |
| | Umbrella Liability Policy | Unknown |
| Land Improvements | | $436,030.52 |
| **Total Assets** [3] | | **$500,026,308.10** |

**Less**

| | | |
|---|---|---|
| Secured Creditors | | $57,264,645.50 |
| (Est.) Capital Gains | | $97,700,000.00 |
| (Est.) Chapter 7 Trustee Fees and Expenses [4] | | $40,052,817.55 |
| Chapter 11 Administrative Expenses | | $325.00 |
| Priority Claims [6] | | $397,500.28 |
| **Total Secured, Administrative and Priority Claims** | | **$195,415,288.33** |

| | | | |
|---|---|---|---|
| (1) | Balance for General Unsecured Creditors | | $304,611,019.77 |
| (2) | Total Dollar Amount of General Unsecured Claims [7] | | $551,432.77 |
| | Percentage of Claims Which Unsecured Creditors Would | | 100.00% |

## Sandton Credit Solutions Master Fund IV, LP's Asserted Values [1]

**Assets**

| | | |
|---|---|---|
| Cash on Hand | | $0.00 |
| Accounts Receivable | | $0.00 |
| Inventory | Water Inventory | Unknown |
| Machinery, Equipment, and Vehicles | | |
| | 1996 Case Backhoe Loader | $26,308.10 |
| | Wells | Unknown |
| | Water Delivery System | $248,767.92 |
| | Well Equipment | $492,351.25 |
| Real Property | | |
| | 4-S Ranch ("Property") [2] | $14,985,000.00 |
| Interest in Insurance Policies or Annuities | | |
| | Umbrella Liability Policy | Unknown |
| Land Improvements | | Unknown |
| **Total Assets** | | **$15,011,308.10** |

**Less**

| | | |
|---|---|---|
| Secured Creditors | | $57,264,645.50 |
| (Est.) Capital Gains | | $0.00 |
| (Est.) Chapter 7 Trustee Fees and Expenses [5] | | $5,274.99 |
| Chapter 11 Administrative Expenses | | $325.00 |
| Priority Claims | | $397,500.28 |
| **Total Secured, Administrative and Priority Claims** | | **$57,667,745.77** |

| | | | |
|---|---|---|---|
| (1) | Balance for General Unsecured Creditors | | $0.00 |
| (2) | Total Dollar Amount of General Unsecured Claims [7] | | $551,432.77 |
| | Percentage of Claims Which Unsecured Creditors Would | | 0.00% |

## Calculation with Water Delivery System and Well Equipment

**Total Assets**    $500,767,427.27

**Less**

| | | |
|---|---|---|
| Secured Creditors | | $57,661,346.18 |
| (Est.) Capital Gains Tax | | $97,700,000.00 |
| (Est.) Chapter 7 Trustee Fees and Expenses | | $40,112,107.08 |
| Administrative | | $325.00 |
| Priority Claims | | $800.00 |
| **Total Secured, Administrative and Priority Claims** | | **$195,474,578.26** |

| | | | |
|---|---|---|---|
| (1) | Balance for General Unsecured Creditors | | $305,292,849.01 |
| (2) | Total Dollar Amount of General Unsecured Claims | | $551,432.77 |
| | Percentage of Claims Which Unsecured Creditors Would Receive or Retain in Chapter 7 Liquidation | | 100.00% |

## Calculation with Water Delivery System and Well Equipment

**Total Assets**    $15,752,427.27

**Less**

| | | |
|---|---|---|
| Secured Creditors | | $57,661,346.18 |
| (Est.) Capital Gains Tax | | $0.00 |
| (Est.) Chapter 7 Trustee Fees and Expenses [8] | | $114,644.18 |
| Administrative | | $325.00 |
| Priority Claims | | $800.00 |
| **Total Secured, Administrative and Priority Claims** | | **$57,777,115.36** |

| | | | |
|---|---|---|---|
| (1) | Balance for General Unsecured Creditors | | $254,957.41 |
| (2) | Total Dollar Amount of General Unsecured Claims [9] | | $551,432.77 |
| | Percentage of Claims Which Unsecured Creditors Would Receive or Retain in Chapter 7 Liquidation | | 46.24% |

**Footnotes**

| | |
|---|---|
| 1 | Liquidation analysis is being provided based upon Sandton Credit Solutions Master Fund IV, LP's ("Sandton") asserted values in an effort to provide full disclosure to creditors and parties in interests. |
| 2 | Value based upon a October 2019 appraisal conducted for Sandton that does not include separate values for all associated or appurtenant water, water rights, water-related assets and water interest of the Property.  See  Dckt. No. 21; Dckt. 23, ¶ 13; Dckt. 29-30, Exh. G. |
| 3 | The calculation also does not include any separate value for fixtures of the subject property |
| 4 | Cost of sale is estimated at 8% for all trustee calculations. However, cost can be significantly higher based upon the unique nature of 4-S Ranch. |
| 5 | Analysis assumes that the Chapter 7 Trustee would abandon 4-S Ranch due to the lack of equity based upon Sandton's asserted valuation. Liquidation is based solely on the 1996 Case Backhoe Loader. |
| 6 | California Franchise Tax Board filed a priority tax claim for $800.00 on April 8, 2020 as Claim #3-1. |
| 7 | Secured claim of Sandton is also secured in property of Stephen William Sloan's estate, Hamburg Ranch, and is also personally guaranteed by Mr. Sloan and Patti Marie Harrill-Sloan. Mr. Sloan's bankruptcy schedules reflect $36,582,005.43 in assets including the Hamburg Ranch.  4-S is not certain if non-community property assets held by Mrs. Harrill-Sloan to satisfy the amounts owed to Sandton. Therefore, there could be a deficiency claim of up to $6,896,440.07 based upon Sandton's valuation. |
| 8 | Analysis assumes that the Chapter 7 Trustee would abandon 4-S Ranch due to the lack of equity based upon Sandton's asserted valuation. Liquidation is based solely on the 1996 Case Backhoe Loader, Water Delivery System, and Well Equipment. |
| 9 | Secured claim of Sandton is also secured in property of Stephen William Sloan's estate, Hamburg Ranch, and is also personally guaranteed by Mr. Sloan and Mrs. Harrill-Sloan. Mr. Sloan's bankruptcy schedules reflect $36,582,005.43 in assets including the Hamburg Ranch. 4-S is not certain if non-community property assets held by Mrs. Harrill-Sloan are sufficient to satisfy the amounts owed to Sandton. Therefore, there could be a deficiency claim of up to $6,896,440.07 based upon Sandton's valuation, which would lower the percentage of claims which unsecured creditors would receive or retain in a Chapter 7 liquidation 3.42%. |