**19**

MACDONALD | FERNANDEZ LLP
RENO F.R. FERNANDEZ III (SBN 251934)
ALEXANDER K. LEE (SBN 293724)
914 Thirteenth Street
Modesto, CA 95354
Telephone: (209) 521-8100
Facsimile: (415) 394-5544

Attorneys for Debtor in Possession,
4-S RANCH PARTNERS, LLC

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA - FRESNO DIVISION

| | |
|---|---|
| In Re: | Case No.    20-10800-B-11 |
| 4-S RANCH PARTNERS, LLC, | Chapter 11 |
| Debtor. | DCN:    MF - 14 |
| | THIRD AMENDED DISCLOSURE STATEMENT FOR THIRD AMENDED PLAN OF REORGANIZATION OF 4-S RANCH PARTNERS, LLC DATED MARCH 10, 2021 |
| | Hearing on Disclosure Statement<br>Date:    April 27, 2021<br>Time:    9:30 AM<br>Place:    2500 Tulare Street<br>Courtroom 13<br>Fresno, California<br>Judge:    Hon. René Lastreto II |

## I.    INTRODUCTION

4-S Ranch Partners, LLC, the Debtor in Possession ("Debtor," "4-S," or the "Debtor in Possession"), has proposed the accompanying Third Amended Plan of Reorganization dated March 4, 2021 for consideration by its creditors and interested parties. This Third Amended Disclosure Statement is presented to provide creditors and interested parties with adequate information, as understood by title 11 of the United State Code, about 4-S, the alternatives available for their repayment and the proposed Plan of Reorganization dated March 10, 2021. 4-S believes that its Plan of Reorganization (the "Plan") offers the most expeditious and effective mechanism to pay its creditors.

Please note that the Debtor previously obtained approval of its Disclosure Statement in Support of the Plan of Reorganization Dated July 13, 2020 (Dckt. No. 157; DCN MF-3). The hearing on the Plan of Reorganization dated July 13, 2020 was set for a confirmation hearing on September 29, 2020 at 9:30 a.m. However, Debtor was informed that the Merced County Tax Collector intended to amend its proof of claim to reflect an entirely secured claim rather than an unsecured priority tax claim. As a result, the Debtor needed to conduct substantive modifications to its proposed Plan that necessitates additional disclosures under 11 U.S.C. Section 1125.

Another Disclosure Statement for Plan of Reorganization of 4-S Ranch Partners, LLC Dated August 18, 2020 (Dckt. No. 182; DCN MF-9) was approved by the Court on October 22, 2020 (Dckt. No. 314). The hearing on the Plan of Reorganization Dated August 18, 2020 was set for a confirmation hearing on January 26, 2021 at 9:30am. However, on or about December 8, 2020, the Debtor and Sandton Credit Solutions Master Fund IV, LP ("Sandton") entered into a Stipulation Regarding Motions for Relief from Stay (Dckt. No. 344) that vacated an evidentiary hearing set to start on December 10, 2020 with an agreement relating to relief from the automatic stay and plan treatment. As a result, the Debtor needed to conduct substantive modifications to its proposed Plan that necessitates additional disclosures under 11 U.S.C. Section 1125, which are provided as part of this instant disclosure statement.

## II.          SUMMARY OF PLAN TREATMENT

4-S's principal asset is real property commonly known as known as Merced County Assessor's Parcel Numbers: 049-200-005; 049-200-020; 049-200-022; 049-200-019; 049-200-023; 049-200-017; 049-200-021; 049-200-024; 049-220-018; 049-200-025; 049-220-019; 049-220-016; 049-220-020; 049-240-017; 065-030-004; 049-220-015; and 049-240-016, located on the at the north and south sides of Green House Road, ± 1.5 miles west of Dan McNamara Road, southwest of Atwater, Merced County, California (the "Property"). The Plan centers upon the disposition of the Property for the benefit creditors, other parties in interest, 4-S, and others that may benefit from certain dispositions of the Property. The Plan requires 4-S to secure new capital or new financing, or to sell the Property, all subject to the approval of the United States Bankruptcy Court for the Eastern District of California. 4-S is pursuing new capital or new financing in a multipronged approach the includes selling interest in

the Property and/or signing long term water contracts before refinancing the secured claim on the Property.  If 4-S can secure new capital or new financing to satisfy the claims of holders of claims in Class 1, Class 2, and Class 3 (as directed by holders for Class 3) within one year of the effective date of the plan, then 4-S need not sell part or all of the Property. Through one of those means, i.e., new capital, new financing, or a sale of the Property, the Plan provides for the payments to the following class of claims:

> *Class 1:*     The Allowed Secured Claim of Merced County Tax Collector, which is secured by a tax lien encumbering the Property.

> *Class 2:*     The Allowed Secured Claim of Sandton Credit Solutions Master Fund IV, LP.

> *Class 3*:     The Claims of general unsecured creditors of the Debtor, to the extent they may be Allowed, which are not otherwise classified herein.

> *Class 4*:     The Equity Interests of Shareholder of the Debtor.

On the first anniversary of the Plan's Effective Date, 4-S shall fund all payments required to be made on the Effective Date through new capital, new financing, or the proceeds of a sale of the Property, all of which are subject to approval of the Bankruptcy Court (the "Liquidity Event"). Notwithstanding the Liquidity Event, if the 4-S does not fund all payments required to pay the Class 2 creditor by 5 p.m. Pacific Time on March 31, 2021, Sandton shall be provided with relief from the automatic stay as to the Property with a waiver of the 14 day stay provided under Federal Rules of Bankruptcy Procedure ("FRBP") Rule 4001(a)(3) on April 1, 2021 without any further order of the Bankruptcy Court in accordance with the Stipulation Regarding Motions for Relief from Stay

The Debtor is of the view that each of these classes are impaired, and thus, the holders of claims in those classes are entitled to vote on the Plan.

## III.    BACKGROUND

In 2009, the Property was purchased by Merced Falls Ranch, LLC. Diversion and Use Statements have been filed with the California State Water Resources Control Board ("Water Board") for all four of the natural and manmade water courses on the Property for the years 2009 through 2019. The statements do not confirm water rights but provide information regarding the abandoned flood

flows and appropriate water that has been diverted for storage underground alongside the native groundwater.

In 2013, the Property was purchased by 4-S with financing from NORTH STAR INVESTMENT HOLDINGS LLC ("North Star") that was secured in the Property. Subsequently, in 2014, 4-S agreed to water supply contract with Del Puerto Water District ("DWPD") for a two-year period. From October 1, 2014 until October 1, 2016, 4-S sold up to 11,000 acre-feet of groundwater per a year to the Del Puerto Water District ("DPWD") at a contract rate of $600 per an acre-foot or $750 per an acre-foot depending on whether or not the Patterson Irrigation District was used as a source of diversion.

The passage of the Sustainable Groundwater Management Act ("SGMA") in 2014 substantially changed 4-S's business operations. 4-S has been rigorously working to shift the operation of its business operations to clearly distinguish the sale of native groundwater from the sale of stored abandoned flood water and appropriated surface water, and the banking of client water underground for later retrieval in long term contracts. The Property has a large supply of abandoned flood water from easements that allow the state government to divert flood flows onto the Property as part of flood control projects. The sale of stored abandoned flood water and diverted surface water is not subject to SGMA restrictions on native groundwater use. Stored surface water does not become native ground water when commingled in underground storage facilities and can be retrieved later for beneficial use. However, 4-S's focus on selling abandoned flood water and appropriated water does not preclude future sales of native groundwater within SGMA, and local restrictions.

In 2017, 4-S obtained a loan from Sandton Credit Solutions Master Fund IV, LP ("Sandton"), to refinance the debt owed to North Star to allow for the continued improvement of the Property to operate under the SGMA regulations that have been gradually implemented. The Sandton loan is secured in the Property, and the real property commonly known as Merced County Assessor's Parcel Numbers: 088-190-018; 090-130-028; 090-140-049; 090-140-048; and 088-180-051 (the "Hamburg Ranch"), which is not property of 4-S's estate as it is owned by Stephen W. Sloan ("Sloan"). Santon's secured debt is also subject personal guarantees of Sloan and Patti Marie Harrill-Sloan ("Harrill-Sloan"). In 2018, the loan with Sandton went into default. 4-S and Sandton negotiated two forbearance

4-S RANCH PARTNERS, LLC'S THIRD AMENDED DISCLOSURE STATEMENT

agreements that were each amended once. The Sandton loan became due and payable in 2019 and Sandton refused to grant any further forbearance agreements. A foreclosure sale was scheduled for March 4, 2020. This Chapter 11 case was commenced to prevent that foreclosure sale.

On March 2, 2020, to prevent the foreclosure sale of the Property and certain other real property owned directly by Sloan, 4-S and Sloan filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code, and were assigned cases numbered 20-10800 and 20-10809, respectively. Subsequently, on March 16, 2020, Sandton filed motions for relief from the automatic stay ("Relief Motions") in this instant case and Sloan's personal case. 4-S and Sloan filed oppositions to the Relief Motions. At the initial hearing, the Court determined that Relief Motions were contested matters and set the matter for an evidentiary hearing to determine factual issues regarding the value of the real property securing the Sandton loan and whether the respective cases may realistically produce sufficient revenue for effective reorganization. The evidentiary hearings for the cases were consolidated and set for trial on September 17, 2020. The underlying cases have not been consolidated and are not jointly administered. Due to a motion to intervene by Stephen Smith and SHS Family Limited Partnership, the owners of neighboring SHS Ranch, the hearings were eventually rescheduled to start on December 10, 2020. The motion to intervene was subsequently denied.

Sandton's Relief Motions allege that they are entitled from relief from the automatic stay under 11 U.S.C. § 362(d)(2) to proceed with foreclosure of the Property. 4-S is a single asset real estate case, as such, substantially all its income will be generated from the business of operating the Property and activities incidental. 4-S believes that a foreclosure of the Property will be akin to an expedited liquidation of the estate resulting in diminished payments to unsecured creditors compared to 4-S operating as an ongoing concern. The Liquidation Alternative section below and Exhibit "A" attached hereto contains liquidation analyses based upon Sandton's asserted value for the Property.

On or about December 8, 2020, the Relief Motions were resolved by stipulation. The Stipulation Regarding Motions for Relief from Stay ("Stipulation") provides that Sandton is to be paid in full by 5 p.m. Pacific time on March 31, 2021. If not paid in full by March 31, 2021, Sandton's shall be granted relief from the automatic stay on April 1, 2021, and the 14-day stay provided by FRBP Rule 4001(a)(3) shall be waived in this instant case and Sloan's individual case. The relief from stay

to be granted in favor of Sandton and against the 4-S and Sloan individually shall be binding in any subsequent bankruptcies filed by the 4-S or Sloan and upon conversion of either case to another chapter under the Bankruptcy Code. The Stipulation was approved by the Bankruptcy Court on December 9, 2020. (Dckt. No. 346).

The Property has been improved to operate as a water banking facility that stores surface water underground to be accessed by eighteen (18) wells with a storage capacity of estimated at 500,000 acre-feet of water and a pumping capacity of 50,000 acre-feet of water per a year. Abandon flood flows diverted through easement are personal property once they arrive at the Property. Water stored from abandoned flood flows are occasionally supplemented with appropriate surface water, but most of the water stored underground on the Property is sourced from abandoned flood flows.

4-S works closely with the owners of neighboring property, SHS Ranch, on mutually beneficial water projects. Counsel for SHS Ranch has been engaged in productive discussions with Merced County regarding the Merced County Ordinance No. 1930 on Groundwater Mining and its inapplicability to stored surface water such as abandoned flood floods and appropriated water from surface waterways. Under Merced County Ordinance No. 1930, native groundwater cannot be mined and exported outside of the groundwater basin that encompasses the Property without a permit or exemption. 4-S had been informed that the parties are working towards a modification of the exemption application form for a transfer exemption under Ordinance No. 1930 that allows a landowner to indicate that water stored underground is not natural groundwater subject to the oversight of the prohibition of mining of native groundwater for transfer to purchasers outside of the groundwater basin that encompasses the Property.

However, the progress was not proceeding in a satisfactory pace. 4-S recently obtained approval from the Court to retain special water law counsel. On a parallel path, special counsel is assisting with seeking declaratory relief stating that Merced County's groundwater mining prohibition only applies to the mining and export of native groundwater, and not to retrieval water characterized as personal property and appropriated surface water stored underground at the Property.

Stored surface water does not lose its characterization when commingled with natural groundwater and can be later extracted for beneficial use. 4-S is confident that the exemption form

will be modified, or an alternative decision will be made that will not prevent it from transferring its stored surface water outside of the groundwater basin. If Merced County refuses to approve transfers of stored surface water, SHS Ranch has indicated a willingness to consider litigation to protect its rights to the valuable assets stored temporarily underground. 4-S has made no agreements to share the costs of any professional fees associated with the work being done with Merced County in relation to Ordinance No. 1930 since it has retained its own water law attorney for this matter. Further, the ordinance only places restrictions on mining and transferring of native groundwater outside of the groundwater basin that Property is located within. 4-S can transfer native groundwater within the groundwater basin and/or apply for an exemption to transfer groundwater out of the basin in addition to abandoned flood flows and appropriated water.

4-S has discussed the progress of discussions with Merced County regarding Ordinance No. 1930 with representatives of the United States Bureau of Reclamation ("BOR"). Recently, 4-S was informed by the BOR that once Merced County indicates it has no objections to the transfer of the surface water stored underground on the Property, it will approve of a Warren Act Contract to allow for water to be transferred along federally controlled waterways to purchasers without requiring any further approvals. 4-S anticipates since it has previously had a Warren Act Contract issued that the issuance of a new Warren Act Contract will be relatively quick once Merced County provides a procedure to landowners to indicate they are transferring non-native groundwater.

4-S continues to work with neighboring ranch, SHS Ranch, to monetize the stored surface water below the Property and SHS Ranch. As a result of the collaboration, it has negotiated a conveyance agreement in principle with the West Stanislaus Irrigation District ("WSID") for the right to convey up to 60,000 acre-feet of water over five (5) years through WSID. The finalizing of agreement between the 4-S and WSID is currently pending the outcome of SHS Ranch's dialogue with Merced County regarding County Ordinance No. 1930 or 4-S's declaratory relief request.

4-S continues to diligently negotiate with water districts and individual water purchasers for long term water supply contracts. 4-S has signed contracts to provide 5,000 acre-feet of water and 2,000 acre-feet of water a year to two (2) separate purchasers for five (5) year terms. 4-S has also obtained approval from the water acquisition committee of Westlands Water District ("WWD") for an

7

agreement to provide 25,000 acre-feet of water. 4-S is in the final stages of negotiation and approval by the WWD's board of directors. Further, 4-S has obtained a verbally commitment for the purchase of the remaining balance of the annual 50,000 acre-feet of water pumping capacity of the Property and is in the process of finalizing the contracts.

4-S's managing member, Sloan, is a farmer and businessman. Sloan has been involved in moving water around California by way of sales and transfers since the early 1980's. He invented and was the first to accomplish the sale and transfer of Central Valley Project ("CVP") water contract, the transfer of Mercy Springs to Pajaro Valley. Over the years, Sloan has sold and transferred many thousands of acre-feet of water. Sloan has served on the board of directors of three water districts and still serves on the Oro Loma Water District board as President and Manager. On behalf of 4-S, Sloan continues to negotiate purchase sale agreements and capital investments with interested parties that will assist with reorganization.

On a concurrent path, 4-S applied with the Local Agency Formation Commission of Merced County ("LAFCO") to form the Owens Creek Water District ("Owens Creek Application") to attain public agency status for the purposes of managing groundwater resources with the proposed district in compliance with SGMA and becoming a Groundwater Sustainability Agency ("GSA"). The COVID-19 Pandemic has caused delays to the progress of the 4-S's work with LAFCO to integrate feedback on its application to finalize it for formal review.

4-S believes that the formation of a water district will allow for greater ease in dealing with water districts that seek to purchase water from the Property. Further, formation of a GSA will allow 4-S greater flexibility in sale of water because the agency can use the powers and authorities under Chapter 5 of SGMA to provide a maximum degree of local control and flexibility consistent with the groundwater sustainability goals of SGMA. 4-S believes that the formation of the GSA will open additional opportunities to sell water beyond the current proposed practice of selling stored abandoned flood flows and appropriated surface water.

Currently, the Debtor has placed the Owens Creek Application on hold as it prioritizes its resources to other projects. 4-S has had to make strategic development decisions based upon the resources and time used in the defense against Sandton's Motions for Relief. However, the Owens

Creek Application has not been abandoned, and can be developed further with local officials to augment the value of the Property. The Owens Creek Application and proposed GSA formation are enhancements in value and are not necessary for reorganization or the signing of water transfer contracts, water storage contracts, and negotiating investment in and/or sales of interest in the Property.

4-S also has engaged BOR to be certified to accept water from the CVP for storage. The ability to store water for CVP will provide an enhancement in value because it will allow 4-S to enter contracts to store water in surplus years for both districts and individuals. However, due to the resource intensive work need for the preparation for the evidentiary hearing, COVID-19, and other concurrent water projects, 4-S has experienced delays. During the process of conducting the hydrogeological studies required for CVP certification, 4-S determined that it would be best to lower the priority of the certification process due to a finding that storage of surface water is close to maximum at the Property. The establishment of a CVP certified water bank would be another enhancement in value to the Property that is not necessary for reorganization. 4-S has no expected completion date of CVP water bank certification as it continues to prioritize projects and negotiations that will have a more immediate impact on reorganization. However, like the Owens Creek Application and proposed GSA formation, 4-S has not abandoned the project and it can be developed further as storage capacity and need dictate.

Portions of 4-S's administrative expenses may be funded by non-debtor affiliate, Sloan Cattle Company, LLC ("Sloan Cattle"). Sloan Cattle is a California Limited Liability Company that is owned 50% by Sloan and 50% by Sloan's son, Brett Sloan. Sloan is the sole manager of Sloan Cattle. Brett Sloan serves as Sloan Cattle's chief executive officer. However, the Plan does not preclude funding of administrative expenses from proceeds from new capital, new financing, or the proceeds of a sale of the Property so long as there is no Court order stating the specific expenses is to be paid by Sloan Cattle without the right of reimbursement from 4-S.

4-S files this disclosure statement and accompanying Plan to maximize and realize the full value of the Property.

//

//

## IV.    SUMMARY OF PLAN

**DISCLAIMER:** Any reference of claim amounts asserted by creditors does not signify 4-S's agreement that the amounts are owed. Any amount asserted is subject to the claims allowance and disallowance process of the Bankruptcy Code. The court has not yet confirmed the plan described in this disclosure statement. The terms of the plan are not yet binding on anyone. However, if the court later confirms the plan, then the plan will be binding on the debtor and on all creditors and interest holders in this case. Furthermore, no statements of information concerning the Debtor, or its assets are authorized other than those set forth in this Disclosure Statement.

### i.    Administrative Claims

Debts incurred after the commencement of the bankruptcy case are ordinarily referred to as "expenses of administration" or "administrative claims." Administrative claims have priority over general unsecured claims and must be paid in cash, in full, promptly after the confirmation of a Plan of Reorganization. In this case, administrative claims potentially fall into two categories.

First, professional fees incurred by the bankruptcy estate are entitled to administrative claim priority to the extent those fees are approved by the Bankruptcy Court. As of the date of this document, the only professionals employed by 4-S's bankruptcy estate are its general counsel, expert witness, hydrogeological consultant, and rebuttal expert witnesses. 4-S's professionals and their current estimated are as follows:

| Professional | Role | Estimated Fees (subject to Court approval and standard of the Bankruptcy Code) |
|---|---|---|
| Macdonald Fernandez LLP | General Ch. 11 Counsel | Estimated $50,000 (net of retainer) |
| Lance Doré, The Doré Group | Expert Appraiser Witness | Estimated $50,000 maximum cost to be paid by Sloan Cattle without additional approval by Debtor and Sloan Cattle |
| Dwight Smith, McGinley and Associates | Hydrogeologist Consultant Conducting a Geochemical Evaluation | Estimated $30,000 to be paid by Sloan Cattle ($8,000 retainer paid by Sloan Cattle on or about May 19, 2020 and an additional $10,946.02 has been paid after application of the retainer) |

| Dwight Smith, McGinley and Associates | Rebuttal Hydrogeologist Expert | Estimated $25,000 to be paid by Sloan Cattle |
| Joseph Hughes, Klein, DeNatale, Goldner, Cooper, Resoenlieb & Kimball, LLP | Rebuttal Water Law Expert | Estimated $15,000 to be paid by Sloan Cattle |
| Joseph Hughes, Klein, DeNatale, Goldner, Cooper, Resoenlieb & Kimball, LLP | Special Water Law Counsel | Estimated $20,000 to be paid by Sloan Cattle |

*Please note that as of the date of this document, the 4-S is pending entry of an order approving the employment of this Mr. Smith after approval was granted at a duly noticed and held hearing on February 23, 2021. *See* Dckt. No. 389.

Second, administrative expense priority is afforded to debts which the bankruptcy estate incurs following the commencement of its case in the ordinary course of its business, whether with respect to preserving, protecting, leasing or selling the Property (e.g., utilities, security, leasing commissions) or prosecuting the bankruptcy case (e.g. U.S. Trustee fees). 4-S believes that the only such expenses it is likely to incur is U.S. Trustee fees.

The Plan contemplates that the first category of administrative expense, i.e., professional fees, shall receive the cash equivalent of their claim on or promptly after the Effective Date of the Plan. The Plan contemplates that the second category, effectively the United State Trustee's fees, if any are unsatisfied, shall receive cash equal to the fees, and that any such fee accrued between the period of the Confirmation Date and the entry of the Final Decree shall be paid by 4-S promptly.

**ii.     Priority Taxes**

4-S is only aware of one priority tax claims. The California Franchise Tax Board ("FTB") claims a priority tax claim in the amount of $800.00 as evidenced by proof of claim number 3 on the Court's claim register ("CCR").  Under the Plan, the priority tax claims, as ultimately allowed, will be paid in full with interest from the through the proceeds of the liquidity event, which is the sale of all or a portion of the Property not later than the first anniversary of the Effective Date (the "Liquidity Event"), unless they have previously been paid. The priority tax claim of FTB is unimpaired, and therefore is not permitted to vote on the Plan.

//

### iii.    Class 1: Secured Claim Vis-à-vis Real Property Taxes

The Merced County Tax Collector filed a proof of claim based on real property taxes. The Merced Count Tax Collector assets a claim in the total amount of $396,700.28 as secured upon the property, and an unsecured priority claim under Section 507(a)(8) in the same amount. 4-S listed the Merced County Tax Collector on its Schedule E/F as holding an unsecured priority claim in the amount of $367,884.48. However, on August 18, 2020, Merced County Tax Collector informed 4-S's counsel that it would be amending its proof of claim to reflect only a secured claim in the amount of $396,700.68. Subsequently, on September 11, 2020, Merced Count Tax Collector filed the amended claim reflecting a fully secured claim of $396,882.48.

Class 1 only pertains to the secured claim of Merced County Tax Collector. The Plan provides that the Class 1's security interest in the Property will be retained. The Plan also provides that Class 1 will receive such cash equal to its allowed claim, together with interest at a rate contemplated by Section 511 of the Bankruptcy Code, through the proceeds of the Liquidity Event. The Plan also provides that 4-S need not sell the Property if it can otherwise provide for the satisfaction of this Claim (and claims in Class 2 and Class 3) prior to the first anniversary of the Effective Date.

Holder of the claim in Class 1 is impaired, and therefore, is entitled to vote to accept or reject 4-S's Plan.

### iv.    Class 2: Secured Claim of Sandton Credit Solutions Master Fund IV, LP

Class 2 consists of the allowed secured claim of Sandton secured upon the Property. 4-S's Schedule D represents that such claim is in the amount of $57,264,645.50 as of the petition date. The Plan provides that the Class 2's security interest in the Property will be retained, that it shall be given a lien in the proceeds from the Liquidity Event, that if its claim is not paid in full from the Liquidity Event, then the Court shall condition the Liquidity Event on such terms as may be appropriate to afford the holder of the Class 2 Claim adequate protection of its interest in the Property. The Plan also provides that 4-S need not sell all or part of the Property if it can otherwise provide for the satisfaction of this Claim (and claims in Class 1 and Class 3) prior to the first anniversary of the Effective Date. The Plan provides that the interest rate for the holder of claims in Class 2 shall be the contract rate or the interest rate permissible under § 506 of the Bankruptcy Code.

Holder of the claim in Class 2 is impaired, and therefore, is entitled to vote to accept or reject 4-S's Plan.

**v.    Class 3: General Unsecured Claims**

The claims of general unsecured creditors are assigned to Class 3 under the plan. The Chart below identified unsecured debt based on the Debtor's Schedule E/F and claimants who filed proofs of claims:

| # | Creditor | Scheduled Unsecured Amount | Proof of Claim ("POC") Filed? | POC Amount as Unsecured |
|---|----------|---------------------------|-------------------------------|-------------------------|
| 1 | PG&E | $405,186.02 | No | - |
| 2 | Rodarakis & Sousa, APC | $93,440.94 | Yes | $96,320.34 |
| 3 | O'Laughlin & Paris LLP | $31,800.00 | No | - |
| 4 | Shannon Pump Co. | $11,495.90 | No | - |
| 5 | O. Ray Sheets Accountancy Corporation | $7,229.91 | No | - |
| 6 | Wendel Rosen LLP | $2,280.00 | Yes | $2,280.00 |
| 7 | Corporation Service Company | $0.00 | Yes | $470.00 |
| | Total: | $551,432.77 | | $99,070.34 |

Under the Plan, claims constituting Class shall receive a ratable distribution of the net proceeds from the sale of the Property one year after the Liquidity Event after, of course, the Class 1 claim is satisfied. The Plan also provides that that 4-S need not sell all or part the Property if it can otherwise provide for the satisfaction of claims in Class 3 (and claims in Class 1 and Class 2) prior to the first anniversary of the Effective Date.

Notably, because the Plan rejects all the 4-S's executory contracts and unexpired lease, the pool of unsecured claims may increase. A counterparty to a rejected executory contract or a rejected unexpired lease must file their claims for damages, if any, not later than the 30th day following confirmation of the Plan. The Plan also provides that the interest rate of holders of claims in Class 3 is federal judgment rate calculated under 28 U.S.C. § 1961 if the Debtor is solvent, but if the Debtor is not solvent, then the interest rate of holders of claims in Class 3 is zero percent. The Debtor notes that its schedules of assets and liabilities show that the value of its assets exceed its liabilities.

Holders of the claims in Class 3 are impaired, and therefore, are entitled to vote to accept or reject 4-S's Plan.

### vi. Class 4: Equity Interests

Class 4 is composed of Sloan, the sole and managing member of 4-S. The Plan provides that the holder of interest in Class 4 shall neither receive nor retain anything on account of their Interests in the Debtor unless all the Allowed Claims from Classes 1, 2 and 3 have been paid in full, with interest.

Holder of interest in Class 4 impaired, and therefore, is entitled to vote to accept or reject 4-S's Plan.

### vii. Post-Confirmation Reporting

Not later than 90 days after the entry of the Confirmation Order and quarterly thereafter, 4-S shall file a quarterly post-confirmation status report. The purpose of the report is to explain the progress made toward substantial consummation of the confirmed Plan. The Quarterly reports shall be filed no later than 30 days following the end of the applicable calendar quarter.

### viii. Stipulation Regarding Relief from Automatic Stay

Notwithstanding the above Plan treatment for Classes 1 through 4, if the 4-S fails to fund all payments required to pay the Class 2 creditor by 5 p.m. Pacific time on March 31, 2021, Sandton shall be provided with relief from the automatic stay with a waiver of the 14 day stay provided under Federal Rules of Bankruptcy Procedure ("FRBP") Rule 4001(a)(3) on April 1, 2021 without any further order of the Bankruptcy Court.

## V. TAX CONSEQUENCES

**DISCLAIMER**: 4-S cannot and does not represent that the tax consequences contained above are the only tax consequences of the Plan because 4-S cannot provide tax advice to Creditors. The tax laws embody many complicated rules which render it difficult to state completely and accurately all tax implications of any action. Creditors and parties in interest are urged to obtain and rely upon the advice of their tax professionals about the tax consequences of the Plan. The above disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues this Plan may present to the 4-S.

The 4-S is of the view there will be neutral tax consequences from a joint venture or additional capital contribution. From the perspective of 4-S and of the creditors, the payments made under the Plan will likely have precisely the same tax attributes and consequences as they would have had, if the claims had been timely paid in absences of the bankruptcy case. Any payments by 4-S that otherwise would have been taxable income to the creditor when received, will be taxable income when made under the plan. The tax consequences may differ under two circumstances. First, payments may be made or received in a different tax year because of the deferrals provided by the bankruptcy process, which may impact certain taxpayers. Second, there will likely be tax consequences to any creditors that have already taken a bad debt deduction with respect of any obligation of 4-S when the obligation is paid under the Plan.

In the event of a sale of the Property, 4-S does believe that there will be capital gains. However, tax consequences will have to be specifically determined based upon any agreed upon sale price of the Property approved by the Court. 4-S is a pass-through entity and taxes resulting from the sale of assets will fall to 4-S's sole member, Sloan.

## VI. RISK FACTORS

The Debtor believes the structure of the Plan permits a path that imposes lesser risk to realize and maximize the value of the Property for all interests. 4-S is also required under the terms of the Plan to file quarterly post-conformation reports to explain progress toward substantial consummation of the confirmed Plan, which will allow Creditors and parties in interest to monitor 4-S's progress. As the Plan is structured, if new capital or new financing fails to satisfy the claims of creditors, and fails to obtain court approval, then an orderly sale of the property will occur within a reasonable amount of time. There is a risk that the efforts of 4-S to obtain new capital, new financing, or sell the property will fail. If 4-S fails to fund all payments required to pay off Class 1 and Class 2 creditors by 5 p.m. Pacific time on March 31, 2021, Sandton shall be provided with relief from the automatic stay with a waiver of the 14 day stay provided under Federal Rules of Bankruptcy Procedure ("FRBP") Rule 4001(a)(3) on April 1, 2021 without any further order of the Bankruptcy Court. Relief from the automatic stay would allow Sandton to exercise all of its rights and remedies against the Property including proceeding with foreclosure.

## VII.    LIQUIDATION ALTERNATIVE

The Property, associated water, and wells are not fully liquid, and their full value will likely not be realized if sold quickly. 4-S believes that a relatively prompt sale of the Property would not yield any recovery in excess of the costs of the sale and payment on account of the secured debts encumbering the Property because the sale would not be able to leverage the extensive contacts 4-S has within the water banking and sales industry, and ongoing negotiations that have taken a significant period of time to establish.

To provide all creditors adequate information to allow them to make an informed decision on the proposed terms of the Plan, 4-S has included liquidation analyses offered as Exhibit "A" hereto. The analyses provide alternative liquidation calculations based upon the values asserted by 4-S and the value of the Property asserted by Sandton.  As Sandton's valuation is based upon an appraisal that does not contain separate values for all associated or appurtenant water, water rights, water-related assets, and water interest of the Property, it is included in the liquidation analyses as a representation of a hypothetical minimal liquidation value. *See Declaration of Robert Rice in Support of Motion for Relief from Stay*, Dckt. No. 23, ¶ 13; *Exhibits to Declaration of Robert Rice in Support of Motion for Relief from Stay*, Dckt. Nos. 29-30, Exhibit "G". Additionally, the analyses include alternative liquidation calculations based upon the inclusion of some of the assets that may not be fixtures of the Property as discussed in more detail below.

The 500,000 acre-foot of stored water inventory listed on 4-S's Schedule A/B is not a liquid asset that can be freely sold on an open market. The water inventory is appurtenant to the Property. The collection, storage, and sale of water is tied to the rights associated with the ownership of the Property. In addition to signing water transfer agreements, conveyance contracts will be necessary to move the water to the purchasers, which include a Warren Act contract from the BOR for conveyance through federal waterways. To realize the value of the water inventory, the Property must be operated as an ongoing concern with the necessary contracts and permits.

Even if possible, an expedited liquidation of the water inventory over a short period of time will not net the same value as asserted by 4-S in the Schedules. During different times of the year, there are varying levels of demand for water that directly impact the price of water sold based upon

current wet or dry climate conditions, and already establish water supply allocations. The value asserted by 4-S on Schedule A/B is based upon the value of long-term supply contracts rather than a quick sale. Long-term water supply contracts address the ebbs and flows of water demand with a set price that is a negotiated compromise between the prices obtainable during the highest demand and lowest demand periods.

Further, it will be difficult for a trustee conducting a liquidation to find purchasers with the capacity to store such significant amounts of water for immediate delivery. Water districts have been interested in storing water on the Property due to the lack of suitable storage. Purchasers of water are not likely willing to take on large amounts of water all at once and would seek supply contracts to avoid the cost of creating or leasing additional water storage facilities. Further, water purchasers seeking to store water underground in water banks are limited in the amount of water they can purchase in liquidation because the recharge processes is not immediate and the transfer will need to be done over a longer period of time compared to above ground storage options. Therefore, 4-S believes that in a hypothetical Chapter 7 liquidation, the water inventory will be sold along with the Property without its own liquidation value.

The wells on the Property ("Wells") valued on Schedule A/B at $1,807,568.00 are not personal property equipment that can be removed from the land to be sold to individual buyers. The Wells were dug as permanent fixtures to Property and are uniquely suited for use as part of a mostly interconnected water storage and delivery system on the realty. Removal of the Wells is impractical and will likely result in significant damage and diminution in value to the Wells and Property. As a result, the Wells that have no value in liquidation outside of the value that can be received for the Property.

The water delivery systems and well equipment listed on Schedule A/B have been similarly annexed to the Property as they were intended to be a permanent part of the system of Wells. Water pipes and pumps have been held to be fixtures of real property when they are intended to be installed upon said property permanently as part of an interconnected system. *See Bell v. Bank of Perris*, 52 Cal.App.2d 66, 76 (1942) (pumps installed on concrete slabs, enclosed in specially constructed pump houses on the realty that became an integral part of an interconnected irrigation system on the without which the ranch could not be operated were determined to be fixtures that passed to a mortgagee who

purchased the real property at foreclosure sale); *Robinson v. City of Glendale*, 182 Cal. 211, 213 (1920) ("Where pipes are laid in real estate for the purpose of carrying water to the lands to which they extend, the pipes while imbedded in the soil constitute real property both before the water is carried therein and after the use for that purpose has cased."). Further, Sandton's Deed of Trust includes a lien on all land improvements, including, without limitation, building improvements, stockwater equipment located on or used in connection with the Property, enclosures of the Property, and electric, gas and water lines and equipment located on the Property. *See Exhibits to Declaration of Robert Rice in Support of Motion for Relief from Stay*, Dckt. No. 26, Exhibit "D". 4-S provided values for the water delivery system and well equipment on Schedule A/B, but do not believe they have liquidation value outside of the value of the Property. However, values for the water delivery system and well equipment are included in alternative liquidation analyses in Exhibit A to demonstrate the possible impact on liquidation should said assets be determined not to be fixtures of the Property during liquidation.

Lastly, while Sandton's secured claim is cross-collateralized in Hamburg Ranch and is personally guaranteed by Sloan and Harrill-Sloan, 4-S believes there will be a significant deficiency claim should liquidation of the Property occur on an expedited basis. Any balance of the Sandton's secured claim after the liquidation of the Property would likely be assessed against Sloan's estate, which includes Hamburg Ranch. If Sandton's asserted values represent the liquidation value of the Property, Sloan's estate does not contain sufficient assets to pay off the remaining balance of Sandton's secured claim. 4-S is not certain if non-community property assets held by Harrill-Sloan are sufficient to satisfy the amounts owed to Sandton if the assets of Sloan's bankruptcy estate are insufficient. Therefore, based upon Sandton's valuation and the $36,582,005.434 in assets listed on Sloan's schedules, there could be a deficiency claim of up to $6,896,440.07.

Due the inability to fully realize the value of the Property as an ongoing concern in a liquidation, 4-S believes that any trustee sale of the Property would yield a fraction of the market value of the Property. Based upon the forgoing, in a liquidation, there would likely be minimal, if any, payments to general unsecured creditors.

//

//

## VIII.   CONCLUSION

4-S believes that the Plan offers the best alternative for the highest and fastest recovery for creditors. Thus, 4-S believes that the Plan is in the best interests of the Debtor's estate, creditors, and other interested parties.

DATED:          March 10, 2021                    4-S RANCH PARTNERS, LLC.


By: _____
        Stephen Sloan
        Managing Member

Presented by:

MACDONALD | FERNANDEZ LLP


By: _____
        Reno F.R. Fernandez III
        Alexander K. Lee
        Counsel for the Debtor in Possession
        4-S RANCH PARTNERS, LLC

**VIII. CONCLUSION**

4-S believes that the Plan offers the best alternative for the highest and fastest recovery for creditors. Thus, 4-S believes that the Plan is in the best interests of the Debtor's estate, creditors, and other interested parties.

DATED:        March 10, 2021              4-S RANCH PARTNERS, LLC.


By: _____
        Stephen Sloan
        Managing Member

Presented by:

MACDONALD | FERNANDEZ LLP


By: _____
        Reno F.R. Fernandez III
        Alexander K. Lee
        Counsel for the Debtor in Possession
        4-S RANCH PARTNERS, LLC